Case 12-1032, et al., Dodge of Naperville, Inc. and Burke Automotive Group, Inc., doing business as Naperville Jeep Dodge Petitioner v. National Limb Relations Board. Mr. Hendricks for the petitioner, Mr. Callahan for the respondent. James F. Hendricks, Jr. Good morning, members of the Court. My name is James F. Hendricks, Jr., and I represent Dodge of Naperville and Naperville Jeep Dodge. We are the petitioners in this matter, and I'd like to give the Court a little background to how this all evolved and why we're here before you today. This goes back to when Chrysler Corporation went into bankruptcy, and they vowed that In the process, my client, Ed Burke, had two dealerships. One sold exclusively Dodge products, which was in Naperville, Illinois. And in that particular dealership, he had six unionized technicians. He had one other dealership in the adjoining suburb called Lyle. In that facility, they sold both Dodge and Jeep vehicles. In that facility, they had 14 non-union technicians. When Chrysler gave the word to Ed Burke to close one of his dealerships, he implored them to keep the one that had the most employees and the most products that he could sell, which was the Lyle dealership. In the process... Can I ask you, at the Lyle dealership, have they ever had a unionization vote at all? No. And then, can you tell me, do we know now how many of the original Naperville mechanics that moved over to Lyle are still there? Four. Four are still there. Thanks. At any rate, when the bankruptcy court instructed him to close his one dealership, rather than just laying off the employees, he offered them all jobs at his other dealership. Four of the six accepted those jobs, and they're still there today. When these technicians went over to the other dealership, it was a fait accompli because Chrysler had closed. You could not sell a vehicle out of the Naperville facility or service them under warranty because that's what the franchise agreement calls for. When the individuals, the remaining people from Naperville, went over to Lyle, they worked side-by-side, stall, if you will, by stall, next to the 14 non-union people. They were under the same supervision, the same roof, as the 14 people. So we had, essentially, the numbers are 30% were former union people, 70% were non-union. So why isn't this just a transfer? A transfer? Yeah. Because if it were a transfer, the entire body of people in that dealership would have gone over there. If they didn't, the only people that went were six people. That was the totality of the people from the Naperville store that went to Lyle. So when they… Was there ever a fact-finding as to when the integration happened? What day? Because it seemed like there was, no, you'll have to reapply, and then it wasn't apply. They sort of just gave them the jobs, and it seemed to trickle in over about the course of a week, maybe. It was a separate corporation, so they asked them to fill out an employment application for that separate corporation. Is there a finding, or do you have a position on what the day of integration was? It would have been the following Monday. The 19th of June in 2009 was when they were told to close that dealership. Saturday morning, the technicians were called to come to the dealership and pick up their toolboxes. They have very large toolboxes. I'm sorry. Was it the 19th of Friday? The following Monday, they reported to work at… 19th was which of those days? Friday, Saturday, Monday? 19th was Friday. Friday. Saturday was the 20th. Okay. On the 22nd, they reported to work at the Lyle dealership. And in your view, that's the date of integration? And what? That's the date that they integrated the dealership? Yes, it is. It was a complete integration. There was nobody left. As I indicated to you, the dealership had no advance notice from Chrysler. They were called the afternoon of the 19th and said, close the dealership, start selling out of the other store now. There were two franchises involved, and that's why it's the franchise issues that get involved with where you can and cannot sell these particular vehicles or service on warranty. So rather than laying them off, Ed Burke hired them all at his new store or offered employment to all of them at the new store. At the old Lyle facility. In this particular case, the board has only looked at the history of bargaining. They ignored the accretion of this group into the two units. They completely ignored the community of interest factors that were there and the majority representation issue because, according to the National Labor Relations Act, which has been around since 1935, in order to have a recognition of a union, they have to represent 50% plus one, if you will, a majority. What's your authority that this wasn't a transfer because, even though all of the mechanics transferred over, the other employees like salespeople, et cetera, did not? With all due respect, Your Honor, it wasn't a transfer. They applied and were given jobs at the other corporation. Well, I asked you earlier whether it could be treated as a transfer, and your answer was no because not all of the employees went over. That was the reason you gave. Meaning salespeople, office clericals, everybody else. So is that the reason it's not a transfer, or is the reason it's not a transfer because you say they applied for? Those are the reasons it's not a transfer, in my opinion. Well, how is it that they applied for other positions when their employment was continuous, and the two people who didn't move over to the Lyle facility applied for unemployment, and your client opposed that? Yes, they were offered jobs. They had valid job offers and chose to go for unemployment when at the time of the hearing before the ALJ they still weren't employed. They had bona fide job offers doing the same job in a different facility. The same job under different conditions? Yes, totally different conditions. First of all, it's a nine-unit shop. They had different supervision, different building. So all of the community of interest factors that the board normally considers were there. Similar skills, highly skilled people, by the way. Functional integration within one facility. The supervisory organizational structure was different in that facility. The one factor that the board chose to focus on was history of bargaining. Well, that belies the fact, but any time you have an integration of a non-union shop and a union shop, you're going to have a history of bargaining. Well, what do you say about, do you think that they're wrong on the law that when there's a history of bargaining it requires compelling circumstances to reach a different conclusion? Do you think that test is wrong? I think it's wrong not to look at the community of interest. They only focus on history of bargaining. That's not what they said. They said that they agreed that the others were important, but that where you have a history of bargaining, you have to have a compelling circumstance to go the other way, right? Correct. And do you agree that that is the test, that where there is a history of bargaining? I don't believe that that should be the only test, and that's how they treated it. They didn't say that. Let me just ask again. Do you agree that the test is that where there is a history of bargaining, the board puts heavy weight on that and requires compelling circumstances to overcome the significance of that history? Do you agree that is the test? I do. That is the test. They said they were applied. Yes, but they didn't. I understand. So I'm just trying to make, this is not a case about the wrong test. This is only a case about the way in which the test is applied in this circumstance. Yes. And, Your Honors, all of the cases cited by the board are totally inopposite to what actually happened here. They rely on Comer and some other cases that factually have nothing to do with what took place here. I want to follow up on the question you were just asked. I guess this gets to be a fine distinction sometimes. Is your position that you just don't like how the test was applied to these facts or that the test was changed to eliminate any sort of causal connection between the finding of an unfair labor practice and the prospect that there would have been two separate communities of interest, or they would not have been integrated? They changed the test. And what evidence is there in the record that if you had done, let's assume you had that, I know your position is that you didn't, but assume you had the duty to engage in effects bargaining. What is your answer, I guess, to their argument that that effects bargaining would have included these terms and conditions that you now say were all the same? So we just can't tell whether they would have been the same if you had done the effects bargaining you were supposed to have done. I think their position totally ignores the authority that's out there. For example, they ignored Transmarine, which tells you the effects of not participating in effects bargaining. There's a limitation on that. Can effects bargaining include wages and conditions of employment at the new location? No, I don't believe it had anything to do with the employment at the new location. I'm just asking you whether that's something that effects bargaining as a matter of law is allowed to encompass. No, in my opinion,  Well, what happened at that point, part of what happened at that point in time was how they came to the terms on which they came to work at the Lyle dealership. Well, again, there was a one-day timeframe when this took place. The board specifically rejected that. The ALJ and the board both rejected that argument, that you didn't have some advanced time here when you could have at least said, hey, something's in the works, changes are coming, see the bankruptcy action. We know something's going to happen here. We're not sure exactly how it's going to shake out. So I don't think we can go with your one-day theory. But not having bargained has no bearing on the end of what actually took place because the transfer was a fait accompli. And I'll use the word transfer, Your Honor. They were over there. There was nothing to bargain at that point, except should my client have bargained on the effects, yes.  And I think the board was naive to say that they could have had different benefits and wages for the six people than the 14. Well, they weren't naive. They said your client's failure to engage in this bargaining made it, I think in their words, impossible to tell. And so it was on what the consequence of bargaining would have been, whether it would have ended up with one unit or two. And so I'm trying to get your response, both as a matter of law and fact, to that analysis by the board. Again, Your Honor, I don't think that the effects of bargaining created the situation because once the decision was made by the bankruptcy court to close the dealership, it was a fait accompli. If they chose to take the jobs, they were going to be in Lyle, not Naperville. What about bargaining over what seniority these four mechanics would have? The board would like to impose different seniority on people who never worked at this dealership. That's their position. They want to impose different terms and conditions of employment when there is a community of interest among the people who are already there. If they chose those jobs, they chose the jobs under the terms and conditions of employment that existed at the Lyle facility. But if you had bargained with them, if you'd said, even if you only had that day, you said, look, let's come and let's sit down and talk. We've got a couple hours. You could have – I think you would agree you could have bargained for different seniority. Whether you would have reached or not, put aside, that certainly would have been a legitimate subject of bargaining, correct? On a Saturday, I think it's highly unlikely that bargaining could have occurred that day. My question is not what the result would have been. My question is that would have been a legitimate subject for the union and you to bargain over, correct? Which subject? Seniority. Seniority? They could ask. There's no obligation to agree. Isn't this what happened in Comar, at least with respect to the law? I'm just going to read you this section. The petitioners argue because a respondent has refused to bargain about the effects of relocation, which was the issue in that case, and the ALJ says in cases involving relocation of unit work, the board has held that the obligation to bargain over the effects of the move on unit employees includes the obligation to bargain concerning the terms and conditions of employment under which employees will initially be employed at the new location. So that makes the answer to Judge Millett's question, yes, they could have bargained over the terms and conditions of employment under which the employees will initially be employed at the new location, correct? Yes. But in Comar, you're – Now, your second question was, well, there's no guarantee they would have reached that result. And in Comar, the ALJ says the board has applied the same principle, situations that involve a merger of operations. Thus, these changes can be – but these – because of the absence of the bargaining, these changes were unlawful. Thus, these changes can be accorded little weight in determining whether the unit remained appropriate. The board told otherwise would allow a respondent to benefit from its own unlawful conduct. Isn't that then a precedent for the proposition that when a company does – unlawfully does not engage in effect bargaining, it is permissible for the board to assume for the purposes of at least the initial employment that they would have been – the union would have been successful? I totally disagree. In Comar, the facts are totally different. I'm not asking about this again. This is, again, a separation of facts and the law. What I'm trying to figure out is this is a case where every case is distinguishable on its facts, but the description of the law in Comar seems to be the same law that the board is applying here. Is that wrong? Why is that description wrong? The board says they should have engaged in effects bargaining over terms and conditions. They didn't. So now we're not going to allow the change in the terms to have a role in the determination of whether it's the same unit or not. In Comar, they went – they merely closed a plant and moved them to another plant where there was no union presence. They didn't commingle with other employees, and therefore, there was – All those are reasons that the case is distinguishable, but the law point doesn't seem distinguishable. The law point is that you can take into consideration the – you can assume, the board can assume that the effects bargaining would have gone the union's way when it was unlawful to not engage in effects bargaining. I don't disagree that effects bargaining could have been entered into, but it has – there's no guarantee that anything would happen with that. Isn't that exactly what the LJ said in Comar? These changes can be accorded little weight to hold otherwise would allow the respondent to benefit from its own unlawful conduct. That's the same point that the board's making here. But I don't see where there's a benefit to the petitioner here. Well, obviously, you would not be standing here if the petitioner wanted these employees to be regarded as a separate unit and with the union representing them. So, obviously, from the point of view of the employer, it is a benefit to not have them represented by the union. Isn't that right? Otherwise, you wouldn't be here. I assume you wouldn't be paying – No, if they had just laid them off, we wouldn't be here. Well, you might have a different set of unlawful activity under those circumstances. You already have a threat of laying people off, which the board found to be unlawful and which you're not even contesting. If you had actually laid them off in order to prevent unionization, you might have an even bigger problem than you have. But in any event, that's not the question before us. Are there further questions from the bench? No. Thank you. We'll hear from the board. Douglas Callahan, National Labor Relations Board Good morning, Your Honors. Douglas Callahan on behalf of the National Labor Relations Board. The board is willing to admit that the particular remedial situation crafted in this case creates a somewhat awkward bargaining situation for the employer. You've got two groups of mechanics working side-by-side under similar conditions, except for significantly superior pay and benefits that one group receives. Well, I'm going to go back and ask. If you had – so imagine they're all working together now at Lyle. Six of them are paid on the terms they were at Dodge and have the same pay and hours they had at Dodge. The rest don't. But as to everything else, same location, same work, same supervisor, can wages alone – wages and hours alone – well, the hours would probably be the same. They're all there trying there for at least 40 hours trying to get it. So the only difference would be wages, I think, and then the guaranteed pay. Would that be enough to make them a separate unit? Under the compelling circumstance – well, first of all, if I could just correct the fact that it's more than just superior pay. It's also significantly better benefits and also guaranteed hours. Two employees actually couldn't. So I'll wrap the gate because the pay, I think, is influenced. The pay difference includes the fact that they're going to get it whether they do the work or not, the guaranteed pay. So just focus on that. Try and see foods. The in-circuit precedent that talks about the compelling circumstances doctrine very, very strongly supports what the board says in this case, that where you do have significant bargaining history, in this case, two decades under which these Naperville mechanics were represented by local 701, then only compelling circumstances can cause the dissolution of bargaining. Yeah, but I think the board here agreed that, you know, but for the failure to bargain over effects, you had compelling circumstances here because these folks were integrated in every way conceivable. But I would say that that begs the question. But for the effects bargaining, I mean, effects bargaining is really the ULP that began this. Right. So then this all turns on what the consequences. So we can get to that, but I still want to back up and get to my preliminary one. Could wages alone, including the guaranteed hours, because that's guaranteed wages that the other employees didn't get, could that alone have made them a separate unit? Just that question. Standing alone, I don't know of board precedent that would make them a separate unit. Didn't Abbott Hospital say no? History and wages alone, when you have everything else the same, wasn't going to be enough there? I think the board's decision is consistent with that reading of Abbott Hospital, Abbott Northwestern, yes. Okay. And so then we need to get to this question about can the failure to bargain over effects lead to this remedy, the board's conclusion that we can't tell what would have happened, and so we're going to, I guess, assume for the purpose of our remedy that you're a separate unit. And have you remedially treated as a separate unit for some period of time? Well, I would argue that that's really just the natural consequence of a very, very typical remedy in this situation. I mean, taking the effects bargaining first, that's the first violation. The remedy for effects bargaining is restoring the status quo ante. And then once you have that status quo ante. We can't restore the status quo ante because the status quo ante was they were working at a place that no longer exists. And that relocation decision is not something that the board would consider to be part of the status quo ante because that's a core management prerogative, a core management decision that the union has no right to bargain over. It's not part of the effects bargaining. We're just talking about the status quo ante with regard to effects bargaining. And the closure and consolidation here are perfectly lawful. Aside from the failure to effects bargain, you don't have any dispute. My understanding is there's no challenge that the closure or consolidation itself were an unfair labor practice. An employer, right, an employer, and this is first national maintenance. Well, in this case, there's no argument here that the closure was driven as an unfair labor practice. The consolidation, moving folks from there to Lyle was an unfair labor practice. That's right. That's a core management decision about how to manage their capital that the board has decided is not significantly aided by the process of collective bargaining. That's why we have this effects bargaining distinction, right? There are certain decisions that lie at the very heart of an employer managing its business. And then there are other things where the employer has some leeway, some ability to bargain with the union about details. Like, for example, the terms on which employees will be transferred to another facility. And, for example, whether those employees will be able to carry their seniority. On that point, there's been some discussion about the state of the law. I believe the court is right to fasten on the first decision in Comar. There were two decisions in Comar, 2003 and 2007. We want to look at the first one, 2003. In that one, in that case, the right of a union to bargain over the conditions at the transferred facility was established. And that case was enforced by this court in 2004. And then there's Comar Thermometer, one of Judge Friendly's cases, in which Judge Friendly specifically speaks to this issue of the transfer of seniority and says that that's something that the union has to bargain over. And that's a condition of employment, right, at the second facility. But the argument here is that, as I understood the board, correct me if I'm wrong, was not really about seniority. It was, wow, you could have negotiated wages and terms of employment that would have essentially, we don't know, but you could have done it in a way to such a degree that this would have been a separate unit. Is that correct? Right. I mean, seniority wasn't in play because there wouldn't be a seniority, a relevant seniority distinction between the unrepresented and the representative. Right. So that's off the table. So I'll just tell you what is troubling me so you can tell me why I'm wrong, is that in all the other cases, including Comar, there was either a causal, there was a causal connection that could be found between the alleged unfair labor practice violation and the creation or the potential creation of a single versus a separated units. In Comar, for example, they were actually very distinct. They didn't merge at all. So there was a substantial evidence basis for the board to determine that the only thing that may force them into a single unit here was the failure to bargain over the effects of the transfer. Here, I didn't see any causal finding or any substantial evidence, or point me to it, to suggest that the failure to engage in effects bargaining had any impact on whether this was going to be one unit or a separate unit. Once they got there, it seems untenable that it would have been a separate unit. And that's what I think is different. But tell me how I'm wrong. Well, I think you're presuming, you're making certain presumptions about how collective bargaining would have turned out. And I think this court and also the board have to remain agnostic about collective bargaining. The idea behind collective bargaining is that you have a difficult decision that involves labor and management, and you force them to sit down at a table. And according to the terms of the act, you don't presume that the bargaining is going to come out one way or the other. You don't order a particular result. And in this case, for example, the board doesn't say how, like what ultimately has to result from the two parties sitting down and bargaining over this transfer of the employees. It could very well turn out that the bargaining goes poorly for the union. And the union's bargaining unit doesn't survive. No, but I guess, don't you need some record basis for thinking that the violation had some impact on this result, this factual result on the ground? And I don't see any, I mean, can you hypothesize any basis? Just hypothesize for me any basis on which all that bargaining assumed the best faith by everybody and assumed they reached something that was going to have these mechanics be a separate unit. At Lyle, it just seems inconceivable to me that you're going to have two mechanics units in a single garage. I mean, I think, you know, I think that kind of hypothesizing is actually prohibited by the act. I think that's not what we're supposed to do. I mean, is there an imaginable situation in which the bargaining unit could continue? Yes. I mean, I think, you know, it's possible that the employer could sit down at the bargaining table with local 701 and realize that these Naperville mechanics and the benefits that they receive are the benefits that everyone at the Lyle facility should receive. And he could raise all, you know, excuse me. That's not a separate unit. Excuse me, excuse me, I misspoke. If I could take that back. I'm sorry. You're right. I mean, he could recognize that it would be simply unfair and create six disgruntled mechanics if he were to take away their benefits. And he could permit those benefits to continue. I mean, that's certainly imaginable. That seems to be contrary to all the board cases talking about when, again, like Abbott, where you can't have these separate units. You're essentially turning this effects bargaining into the ability to have a minority union at Lyle. Well, and again, Abbott is distinguishable because you don't have the compelling circumstances analysis being brought to bear there, as the board said in its decision. I'm sorry, explain that in a little more detail. Well, right. So in Abbott, there's no discussion by the board of any significant history that the represented employees have. No, but they had, I think, like ten years of representation there, correct? It's simply not part of the holding your own. No, but it's part of the facts, right? It might be part of the facts, but it's not part of the law. And so what you don't have there is the compelling circumstances test, which is very well established in frightened seafoods. If I could talk a little bit. I'm sorry, I just want to let you make your point. I just want to really make sure I understand how this works. So your view, you understand the board's decision here to be that once we find an effects bargaining violation, and unlike the other cases, we can't tell. There's no basis for us, one way or the other, to know whether that had any impact on them being a single unit or not. All the other ones, they knew it had an impact because they didn't actually integrate, or it seemed there was violations in how they actually sort of brought this whole consolidation process together. But when we just can't tell, then we can impose a remedy that at least for a year, six months or a year, has a minority union functioning. No, I mean, I don't think that's going to be the result in every case. I mean, let's imagine that. No, it's the result in this case. It's the result in this case because of significant bargaining history. Imagine that Local 701 had just been elected the bargaining representative of these employees at the time that the transfer occurred. There's no significant bargaining history. And at that point, the employer then, in violation of the law and without effects bargaining, transfers these people to Lyle. In that situation, you don't have the compelling circumstances test involved, right? All you have are potentially, you know, a failure. It actually seems worse. It seems like it would look like the employer, you'd probably have an argument the employer was trying to defeat the union by moving everybody over here. Yeah, you had a long history, but you also had a collective bargaining agreement that's going to expire in about two weeks and is now going to be, by this remedy, extended for, as a practical matter, for a year at least. That is one of the consequences of the board's affirmative bargaining order, and one of the reasons why it's required in this case is exactly because the employer so totally disregarded the union's status. So there could have been a reasonable separate unit for the transition period, but for the way in which the employer acted, which is not necessarily any requirement that it would have continued after the collective bargaining agreement ended, right? Since once that agreement ended, then, and if it ended and in good faith there was no more bargaining, that would be the end of it. Then there would be no argument at that point for a separate unit, correct? Right. I mean, if the employer had complied with the law and had actually done a fax bargaining and had fulfilled its duty and decided to ultimately at the end of it, you know, and ultimately at the end of it there weren't distinct terms and conditions of employment for these employees, as opposed to the Lyle employees and they were transferred over to Lyle. We wouldn't be talking about the CBO. The same is true here. At the end of the good faith bargaining period, if there's no agreement on the same terms and conditions, that would be the end of the question. And at that point, we would no longer have any presumption based on the fax bargaining and the history would be nice, but too bad. The history's over. Right. And at that point, it could be one unit. Right. So what we're really only talking about is whether it could be a separate unit during this transition period. Is that what the board said? No, I don't. That at least last part I don't quite follow. I mean, in this particular remedial situation, given the remedy that the board ordered, the local 701 is the union at Lyle for those six employees and will continue to be such until the bargaining unit becomes inappropriate for any particular reason. Well, would it become inappropriate if at the end of the good faith bargaining period, there's no agreement that leads to terms and conditions that are any different from that of the other? If that were the product of good faith bargaining, that suddenly Naperville and the Lyle mechanics have the same pay and benefits, then yes. Under those circumstances, even with the significant bargaining history, there would be compelling circumstances showing that these two groups of employees should be one bargaining unit. So you can actually just negotiate your way into a permanent creation of essentially a minority union in a workplace if everything else, everything else suggests integration. Same place, location, same work done, same supervisor, same tools, same uniform. Well, that's the question I'm asking. You're saying what the union can do, or what the board can say, that in fact they could have, this employer could have negotiated with the union a situation where at Lyle, from the time of transfer going forward forever, because of course those six employees are always going to agree to have better benefits and pay than their colleagues. You could negotiate your way into having two different units that for every other reason and factor recognized by the board would be a single consolidated unit. So first of all, I would say that it wouldn't be a minority union situation. The minority union term is reserved. No, I understand that, but it's a functionally we've done now. It's a possible result. We can't have a union for everybody, so let's just have it for these six folks, and let's keep it going as long as those six folks want to have it going forward forever. It's not for their unilateral determination. I mean, the employer, you know, they're allowed to make that proposal at the bargaining table. The employer is going to make a proposal that presumably is going to be different, and then we'll see where bargaining takes us from there. Maybe you've got an employer who loves the union, is so upset, so upset these Lyle folks, assume, had voted down the union. I'm going to show them they shouldn't have voted down the union. I love union. I was raised by unionized parents, and so we're going to go forward, and then they're really going to be sorry they voted against the union because the people right next to them laying there, you know, working on the rear tire while you work on the front tire are getting paid more, more hours, and better benefits. I don't really know that that fact situation washes, because in that situation, I mean, with the employer going to have it. Isn't that a reality? Huh? Isn't that a reality of how it's going to feel in this shop? I don't know that there's any, in reality, there's any employer who would act like that. I mean, you've got to assume, I mean, collective bargaining is an adversarial situation. Put away the employer's attitude now, but for at least the time period, which you say can go on as long as they end up with a collective bargaining agreement and all the fights it will go over if there isn't one, you're going to have a time period where literally the person on the rear tire and the front tire have entirely different pay and hours, and probably now the Lyle folks are going to have worse hours because all the guaranteed work has to go to these folks. And they're all going to say it's only because we don't have a union. It's a possible, it's a possible imaginable consequence. The bargaining process is awkward. We're willing to recognize that it's awkward. But you know what? We wouldn't be in this awkward situation if the employer had just done the effects bargaining that it should have at the beginning. It had, you know, it would have had to have been done on a pretty quick timetable given everything, you know, given the swiftness with which the bankruptcy proceeding was going in Chrysler. But the employer could have done it. The employer could have complied with their effects bargaining obligation. If they had done it, then this series of dominoes wouldn't have fallen, which ultimately results in an admittedly awkward situation where you have six represented employees and 14 unrepresented employees working under the same roof. Can you tell me what, if anything, the record shows about the non-union Lyle mechanics, whether they all were paid at the same hourly rate, or did it vary? I can't give you a specific site to that, but my recollection is that they all were paid the same amount. So they all made X dollars an hour. None made, you know, more than that. Right. And they made X dollars an hour, and I believe it was even the same pay rate as the Naperville mechanics. The real difference was that Naperville mechanics had a guaranteed 34 hours of work every week. You show up for work for 40 hours, you're going to at least get paid for 34 of those. In Lyle mechanics, you show up for work for 40 hours, there's no guarantee you're even going to get an hour of work if nobody is coming through the door. And once that guarantee is brought into that shop, those folks that were there at Lyle all along are going to have even less chance of getting work, correct? Because I assume the employer is going to say, I'm going to pay these people for 34 hours no matter what, so everything comes in the door is going to those six until they've got their 34 hours. You know, I don't want to speak to that hypothetically. It might involve discrimination in favor of the union in that case. I'm not exactly – it wasn't presented by this case and the board didn't decide it. But presumably the employer could negotiate and say, look, I can't guarantee you 34, but I'll guarantee you 20, and maybe ultimately transition that 20-hour guarantee to everybody, even if the union – if that unit dissolves, right? Exactly, Your Honor. And if I could speak to your earlier point about relocation – transfer, whether this was a transfer. It most certainly was a transfer, or as the board said, a relocation, in light of the board's finding that this was a single employer, that the Naperville and the Lyle facilities were not two distinct corporations and two – well, they were distinct corporations, but they weren't distinct employers. And so when the employer moved these employees from Naperville to Lyle, it was really a relocation within one integral business. And that's a finding that actually wasn't challenged on appeal. Other questions from the bench? Thank you. Is there any time left? You're out of time, but we'll give you one more minute. If you want it. Most people do. Not always a good idea, but most people do. The one thing that has not been asked or focused on, and Judge, you came close to it, is requiring Lyle to bargain with the union for the six people out of the 20, violates Section 882 of the Act. It tramples all over the Section 7 rights of the 14 employees who were there, and it tells them you are bargaining with a minority unit, and they're precluded from doing so under Section 882. I have nothing further. Thank you. Thank you. We'll take the matter under submission and call the next case.
judges: Garland, Millett, Wilkins